May it please the Court, Anne-Noelle Acalino for the Appellant EEOC. Your Honors, this is an intensely factual case of employment discrimination involving the transfer and layoff of Antonia Castron and the layoff of Renee Reid, who both happened to be the only woman in their respective skill codes at Boeing to be laid off in a RIF in 2002. This, as the Court has said, in evaluating motions for summary judgment in the context of employment discrimination, this Court has emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses. Here, the District Court erred in granting summary judgment and refusing to allow a jury to hear all of the evidence to assess the credibility of our witnesses and to determine for itself whether Boeing discriminated or retaliated against these two women. As to Antonia Castron, the Commission proffered direct evidence that would allow a jury to find that the true reason for her transfer and layoff was sex discrimination. Carlton made, quote, a lot of negative comments about women that were, quote, repetitious over the years. He said things, again, quote, similar to, he didn't want any more women and that women were not worth a shit, and things, quote, similar to, I'm not training a fucking woman. Several times in management meetings, he said he didn't have good luck with females and they hadn't been around long enough for his satisfaction. In connection with the non-promotion of a female engineer named Castron, he felt that women were not up to speed because they didn't have the time and the job and they kind of should come to him all trained. This constitutes direct evidence under this Court's precedent, including Cordova v. State Farm and Chang v. UC Davis. Boeing argues to the contrary, saying that substantial inference is needed to infer discrimination because Carlton's comments were not about Castron or the decision-making process, but that doesn't square with this Court's precedent. In Coghlan v. American Seafoods, this Court said, when evidence establishes the employer's animus toward the class to which the plaintiff belongs, but the statements are not about the plaintiff, the inference to the fact of discrimination is sufficiently small that we have treated the evidence as direct. We, therefore, think that this is enough to get us to a jury. But even if this Court disagrees and construes Carlton's comments not as direct evidence... Does this go to both plaintiffs, both people you represented just now? It does not. This goes to Tony Castron. But even if those comments are just substantial evidence, we think that that's also enough to go to the jury. Boeing concedes a prima facie case of discriminatory termination. The Commission thinks that we established a prima facie case as to the transfer because the jury could find the transfer was adverse because it made Antonio Castron... Is it useful to separate the two? I mean, is it really what you're saying, that she was transferred to a... I mean, it's hard to say, I think, on the record that the termination itself couldn't be justified or was pretextual if she was, if she'd been there because she wanted to be there and without any issue about the transfer. I think that you're correct, that our claim would be much harder if we just focused on the termination without the transfer. And certainly we think the transfer is inextricably linked up to the layoff claim. I mean, the evidence about her abilities in her new job was that she really wasn't prepared for it. She admits she wasn't prepared for it. It wasn't where she should be and she wasn't very good at it. That's true, although we do think that there is some evidence that a jury could find that her scores were fishy and that they weren't credible. A little bit, but even her supporter, Hartrick, whatever his name is, I mean, basically said she wasn't very good. She really wasn't any good at all, but that's because she should have been here. That's true, and I don't want to harp too much on this because I think the transfer was, we have very strong evidence and it's a great part of our layoff claim. Yeah, your theory is she was sort of doomed to failure when transferred. Yes, you know, Boeing's position is that the transfer was a career-enhancing transfer made at her request, but we think that a jury could find that it was a career-ending transfer and that Carlton knew that and set her up to fail. And they've also contended that Carlton had no idea that a rift was coming up, but we think that there's plenty of evidence that a jury could find that he did, in fact, know, including evidence. And that she knew or suspected and asked for assurances and got the assurance. Exactly, so we have Carlton's own testimony. He knew as of August 2002 there was no new billed aircraft for 2003 and a reduction was coming. That's his testimony. And Cashman's testimony is as of August 2002 everybody knew a rift was coming, and in fact I asked him when he talked about the transfer, will I be affected by the upcoming rift, and he said no. Certainly a jury could disbelieve that evidence, but a jury could also believe it. So we think that there's enough to show that Carlton did know that the transfer was coming up. Isn't the real problem with the transfer issue that she wasn't very clear about why she wanted to transfer. And so although she would have preferred a transfer to other places, other units and other people were transferred to the unit that she wanted, she didn't really give her reason at any relevant time. Your Honor, if I could, I'm not sure that it's so relevant to our claim. If I could just explain, she does testify several times about why she didn't specifically She was advised not to, it would have been bad policy, it was supposed to be bad, and so on, so it may be perfectly understandable, but it's also true that Charlton therefore didn't know that it was based on any claimed sex discrimination. Sure, and Boeing's position, I understand it perfectly, is as soon as she said hostile work environment harassment, we got her right out of there. I get that, but still the jury could find that this was all part of a sex discrimination plan on his half because he knew that she would be terminated. As for a retaliation claim, a jury could spin that evidence, find it goes another way, which is as soon as she complained about harassment, then he transferred her over to structures mod knowing that she was going to fail. So I think that this is a question that the jury has to decide. It can't be the law under Title VII that an employer can just say, I transferred this person as soon as she complained, and therefore I can't be pegged for discrimination. I did what I was supposed to do. You have to look and be able to see whether the transfer was an adverse transfer. This court said in Swanson v. Potter that a transfer doesn't necessarily meet an employer's remedial obligation to address harassment if the transfer is in fact to a less desirable location, and we think that a jury could find that to be the case here. We talked a bit about Hobby's scores and whether they would be credible, which we also think could be his own remarks, which a jury could construe exhibited his discriminatory animus towards women, twice calling her a little girl, making a derogatory comment about whether she had broken her fingernail. And moving on to a retaliation claim, I think that we covered the six days between when she complained and when she was transferred would allow a jury to find that there was retaliation, and that that was a career-ending move for her, and could also rely on the fact that Carlton promised her that she would be immune from the RIF if she transferred, but then turned around and laid her off anyway. If you don't have any more questions about Antonia Castron, then I'd like to move on to Renee Reed and our claim of sex discrimination on her behalf. Boeing has conceded, as it must, that the Commission established a crime-information case of sex discrimination that says that she was laid off because of her low scores in the October 2002 RIF assessment. The Commission's evidence, however, would allow a jury to disbelieve that low scores were really credible, and therefore infer the sex discrimination was the reason for her layoff. We offered several categories of circumstantial evidence that would allow the jury to reach this finding. First, there was evidence in the record that Feierstein helped two of the men who received the RIF notices to find other positions, but didn't offer any help to Reed. What do those people say in deposition that he helped them, and then in a declaration that he didn't? There's one person who says in an EEO interview, which was under oath, that Feierstein did call and offer me help. And then in his affidavit, which was under oath, he turned around and said, no, he didn't. But one of them, the EEO statement, says I was offered help, and I think there's no counter to that. But of course, that's a factual dispute for the jury to consider. I'd also like to point out something that I think we didn't highlight in our brief, but if you look at Reed's declaration, you can see in paragraph 20 that she says that several managers who had told her when she was given the RIF notice, I'm going to talk to Feierstein, the head guy, and see if you can be transferred or hard-lined over to me. She means four people specifically, and she said that those four managers went to Feierstein, came back to her, and said, I did talk to Feierstein, but he refused to move you over to me. Your focus on what happened after she received the RIF notice gets so humblingly concerning, which seems to be that it doesn't seem to be the same argument with regard to whether the notice was permissible in the first instance. I would be happy to talk about that. I started with that end, but you'd like me to go to the beginning. Well, I mean, and, but I think there's a practical reason why you started with the end, because to be honest, the beginning part of the argument isn't quite as persuasive as the end, so. I'm not sure it's not as persuasive. I won't quite conceive that, but I think it's so factual that it's hard to follow. So I'd love to take you through some of it. We have Wright's testimony where he admitted some of her objective scores, such as unigraphics, was just plain wrong. Significantly for the category of past performance, which is worth 15 points, he scored her a nine. This was, placed her 29th out of the group of 32 MEs who were assessed. So this is a very low score vis-a-vis the other managers. In his deposition, he's asked about it. He says, I don't, I have no idea why I scored her that. I have no idea how I came up with the categories that compromised her score for ability, for the past performance. And as for her scores for such subjective skills as communication, leadership, and team skills, we highlighted it earlier in a RIF assessment. She'd done fairly well on those. And then Wright downscores her for the October RIF. And although Boeing says that this was because of her lack of communication skills, if you look at the pages they cite, all he talks about for communication, he admits that there was no written record of communication problems, that nobody specifically complained about her communication problems. Wright admits, in fact, in 2002, nobody ever complained about Renee Reed's performance at all whatsoever. Boeing also talks about her low scores were due to her inability to delegate work, which was a criticism that Wright had called a positive flaw in her 2001 evaluation. But if you look at those cited pages of the deposition for Wright, he doesn't say that. He doesn't say I downscored her in the RIF because of her inability to delegate work. And to the extent that was a concern, it was a concern before the earlier RIFs where she had done fairly well. We also have Reed's testimony, where she disputes her scores for such objective categories as unigraphic, CCAR, and wiring, and Dave Arrow's declaration, which the district court in Boeing dismissed by saying that he assessed the charging party in a vacuum. But that's not true. He assessed her scores against his own, and he was subject. And also against some others. He also. He does. He specifically mentions some other MEs and how she performed. But the one thing that is odd is her deposition where she says what other people said, but she doesn't have any, I mean, her declaration, but she doesn't have any declarations for any of those people. Just, I'd like to point out. And people say nice things to other people when they're being fired. I understand, Your Honor. There is one email in the record, if you want something not from her, from Dave Stallings, November 02, to Firestein saying Renee Reed really excelled in PSA, and I just want that in there for the record. But Boeing hasn't disputed the admissibility of the declaration. So at trial, they can argue that your point, which is that we don't have the manager's testimony themselves. There's no question it's to how much the jury was going to weigh that evidence that these scams are coming through. And we think they're admissible as admissions of a party opponent. So I talked about the evidence of the managers. And just to finish up a little bit with Dave Arrow's declaration, this court even said in Hernandez v. City of Vancouver that a co-worker's testimony that the plaintiff's work was scrutinized more heavily because of his race was more than adequate to raise a disputed issue of fact as to the plaintiff's job performance. And we think that that's consistent with cases we cited outside the circuit that said co-worker testimony of a plaintiff's performance is clearly probative of pretext. And I see I'm actually running into some time I'd like to save for rebuttal, if I may, Your Honors. Certainly. Thank you for your argument. We'll hear from the Boeing Company at this time. Mr. Nagy. Thank you. May I please the Court? I'm Keith Bornagi on behalf of the Boeing Company. I'm going to begin by talking about the Reed case, because this is, in fact, two cases. In fact, they are so distinct that the only nexus that really we can talk about here between these two cases is that these employees were working at the same company and that they experienced a RIF at the same time. That's essentially the only connection, other than, of course, that there are policies that we'll be talking about. But with regards to the Reed case, and as the Court was just asking counsel, in terms of the scoring process and what happened and how did the Reed get selected for the RIF, the issue in this case basically boils down to is that EEOC wants the Court to decide how it is that Ms. Reed was going to be decided or terminated under this RIF plan. Well, I mean, isn't the fact that some of the material on that new RIF appellation was flat wrong? Some evidence was flat wrong as a matter of objective fact? Well, the EEOC does point out to a couple of items in this record, and specifically I will point to for the excerpt of record is number 68, which was the April remaining work evaluation assessment score sheet. And I'll also point the Court to page 80 of the excerpt of record, because those are the two comparative forms that she keeps pointing to, and she refers to various scores changing and so forth. Not only changing, but they said that she didn't know certain programs on which she was apparently quite expert. So they obviously didn't know much about what she was doing. Yeah, but the impact of that change, the impact of the question, the question is whether that doesn't demonstrate that they didn't really know much about her when they wrote this down, because they said things that were just wrong. Well, Your Honor, I It doesn't give you much cringe in the person writing this evaluation at all as to whether he knew what he was doing. There are probably, there are, and I'm not going to count them here, but there are at least 20 different areas that the evaluator evaluated this person on. I understand that, but if the evaluator doesn't know whether she knows, and I think there were at least two programs, technical things upon which she seems to be quite good by everybody's account, and when she didn't know that, he thought that she didn't know it at all. Presuming that it even had an effect on the outcome of the score, and what I'm trying to tell the Court here at this point is that the ultimate score difference was one point, 63 points in April versus 62 points in October. That was the sum and substance of the difference, to the extent that it would have made any difference at all. To address Your Honor's question as to whether or not the evaluator knew enough about it to have made, to have made a difference, the answer to that, Your Honor, is this, is that the evaluator doesn't, just because he or she doesn't know, every nuance of what this employee did doesn't create pretext, and it doesn't create an issue of fact for pretext. The question here is whether there was pretext for discrimination. That does not answer that question. It answers the question of whether or not he or she had sufficient knowledge about it. Can't it lend some credence to the notion that somebody just sat down to come up with a number that would put her low on the list? No, Your Honor, it doesn't. It's not sufficient to address that question. Certainly, just because someone doesn't know every nuance about what the employee is doing doesn't create enough of an issue of fact to put this into a jury trial. If that were the standard, Your Honor, every single evaluation program that is out there in corporate America would put us in front of this court, and this court would be the evaluator of whether or not that RIF was appropriate for that individual person, and that is not the standard. How many employees were identified as eligible for the RIF? In the Reid case, there were seven, and Ms. Reid was one of those seven employees. So there were a total of seven. There were a total of seven that were identified for layoff. That's correct, Your Honor. And was she the only woman? She was the only woman in the department. So, yes, she was also the only woman identified in the group. That's correct. And she was RIF? Yes, she was RIF. How about the other six? Well, the other six were also identified for RIF, but as the court, as the record obviously demonstrates, they found other work in various ways and in various fashions. They were not RIFed? They were not RIFed. At the end of the day? Ultimately, they were not RIFed. And didn't one of them come in and say that you didn't do it right, and they said, okay? Yes, that's correct. One of the employees did, in fact, demonstrate that... She came in and said you didn't do it right, but they didn't say okay. Well, there was a difference, Your Honor. There was a difference in the way the scoring was handled. In her case, there was nothing that demonstrated that her scoring would have changed anything in the outcome whatsoever. And her comparison, and I'll move on unless the Court has another question. Her comparison, her attempt to compare herself to others by using witnesses who came in and essentially gave demonstrative testimony that, well, gee, I think she's a good employee, or I think she did a good job. No, but he was very specific. This one guy was really specific. He went through the entire thing. He wasn't overboard either. I mean, as to some things, he agreed that she was maybe not so fabulous, and other things, he thought she was really quite good. And he was very specific about it. But I assume the Court's referring to Mr. Arrow. He did not compare her to the other employees who were in the RIF. He did compare to himself and to a few of the other people. But he didn't do the whole RIF. He didn't compare. There were at least 30 people on this list. He didn't go through this list and compare her to them and to determine whether or not somehow she should have been higher or lower than anyone else on that RIF evaluation score, other than picking and choosing individuals on the list. But he didn't go through the whole RIF evaluation and do an actual matrix to decide where she should fit into that matrix. He said she was better than many other employees, right? Well, he did, Your Honor. But that's one employee's individual assessment based on how he believed she did versus perhaps one or two other people, but not the entire list. And ultimately, Your Honor He didn't go through some specific categories and say, I got a higher rating in this category, but she's much better at that than I am. Yes, he did, Your Honor. But that doesn't change the outcome here. It doesn't create an issue of fact for purposes of whether or not there was pretext. Why not? Why doesn't it at least create an issue of fact? That's all we're doing here. We're not saying she wins or she loses. Because one employee, even two employees, who were to come in and essentially cherry pick and say, well, I think this person could have been I could have been better or she could have been better than I was in that in that individual instance, doesn't create a sufficient issue of fact to put this in front of a jury. That clearly is not the standard for pretext. It's not the standard to demonstrate that there was evidence of discrimination in this case or even evidence that the matrix for one supervisor who actually created the matrix was somehow shouldn't be believed. Again, there just isn't enough. People can poke holes into a matrix evaluation every day of the week. It doesn't change the fact that it's insufficient in this case to go to a jury trial. That's the answer. Who was the supervisor that made the decision to transfer? Is that your esteem? No, there's no transfer in the Reed case, Your Honor. But the RIF list? On the RIF list, the decision maker was Mr. Wright. That was her immediate supervisor. He's the one who actually did the RIF. Who was Fierstein? Fierstein was the next level up. Yeah, I know. I made the same mistake. It's the next level up. He's the manager of this area and he was the one that oversaw the RIF evaluation. Doesn't the record show that other managers of other departments came to Fierstein and asked him to transfer Reed to them because they thought well of her? Your Honor, I went back and read the record to the extent that I could and I don't recall seeing that evidence in the record that others came that other than the plaintiff's saying that they did. I have it as ER 195-99. You may want to take a look at that. Your Honor, I don't have it in front of me. I'm sorry. It's the plaintiff's saying that they did. You didn't object to it. I'm sorry, Your Honor? It is the plaintiff's saying that they did. She was quite specific. She said so-and-so told me, so-and-so told me. Yeah. And you could certainly debunk that evidence, again, by putting them on and saying they didn't say it, but you haven't made a hearsay objection and other than that, what's the problem with it? Well, Your Honor, again, if the plaintiff says that someone came to Mr. Fierstein and said I'd like to transfer those individuals, it doesn't change the fact that they could have been transferred or that there was an opportunity to transfer them or that there was any basis to transfer them. So to even go beyond her statement that she heard someone say, gee, I wanted them transferred, doesn't address the question of whether they could have been. So I think it's, again, it's so remote. Is there a reason why they, I mean, we've been told that there were seven people identified for being laid off and one actually was, the other six, either they pulled back or were transferred. Why is it the case that she couldn't have been transferred? Well, Your Honor, I think to answer that question, one has to look at what she testified about in terms of whether she made any effort whatsoever to address or  But I think that's not what she testified about. In fact, I think she testified about being, in other words, for her to have, no, but she didn't, Your Honor, she didn't go through the process that one does to become employed by the other departments. That she didn't do. And that's clear from the record. I asked her in her deposition on multiple, in multiple ways, did you make any effort to find other employment? And her answer was no. She did not make any effort to find other employment. That's clear in the record. So from the standpoint of whether or not she could have found other work, there is nothing in this evidence, in this record that would demonstrate that Mr. Fierstein or Mr. Wright somehow engaged in discriminatory behavior in terms of selecting her for the layoff. There's just not enough to go there. You want to talk about Antonio Castrone? Yes, Your Honor. And I, I'm sure there, well, let me start with this. The issue, of course, that plaintiff is, there's essentially two issues that plaintiff is trying to pursue here. One, of course, is that the transfer was somehow discriminatory or retaliatory. On the question of discrimination, EEOC never raised that question below. They continue to try to raise that now because the district court addressed it below. Is it all of a piece? I mean, isn't that the, the dividing of the two pieces sort of distorts the problem. As I understand their argument, it's that she was terminated unjustly because she was put in a position that she shouldn't have been put in. And then couldn't succeed given the position that she was put in that space. And that there was direct evidence that the people, the guy who did this at both ends, both the transfer and the discharge, had problems with women that were longstanding. And that's basically their case. Dividing into pieces doesn't seem helpful. Well, it is certainly a factual question. There's no question that what the reason was that she was. How did she deal with her, what was a labor argument or something? Well, essentially what we're saying is, is that it's a little too late in the game for EOC to be claiming that her, the reason for her termination, excuse me, the reason for her transfer was somehow discriminatory. I mean, certainly they're arguing and they have been arguing, and we're not disputing that this argument exists, is that the transfer was based on her engaging in protected activity. Those are two different factual predicates that would require that for them to demonstrate that. So our focus is on the predicate of retaliation. What we're saying is the discrimination issue is off the table. So in terms of the retaliation that she alleges occurred here, we have to look at the background that gets her here. She testified at her deposition that the reason she even ended up in the PSA department, which is a department from which she was transferred to structures, the issue that we're talking about here, she says she moved there on her own, that this was something that she wanted to do to enhance her career. Yet the undisputed evidence also demonstrates that four other electrical engineers who left at that time were moved either to the PSA department or to the structures department. And as the Court will learn from reading the briefs and the record, that three of those four electrical engineers that left the department when she did also were ripped at the same time from the structures department. So any issue that addresses this question, alleges this question, that somehow she was set up to fail to go into those departments. I'm confused. I thought the record was that nobody had been transferred from PSA to structural mod in years. That's not true. Individuals with whom she worked as an electrical engineer were moved from EPC to the structures department. In fact, they moved there before she was moved there. I'm sorry, Your Honor. What's EPC, I'm sorry. It's the electrical engineering group that she was in before she went to PSA. And three of those four engineers also ended up in structures. They got there before she did. And the irony here is that they were there much longer than she was, and they were also ripped at the same time that she was ripped in the structures department. But focusing on this PSA situation, she was in PSA. There's no question. And twice while she was in PSA, at least twice, she told Bill Charlton that she wanted to be transferred somewhere else again to enhance her career. The record is undisputed that she never told Bill Charlton ever that she wanted to move to this, wanted to leave the department or that she was having any problems in the department. Ever, at the end she did. At the end she did, that's correct. But, Your Honor, at the end, the issue changed completely because it was at that point, for the first time, that she notified Mr. Charlton that she had a problem with her coworkers. And somehow, and this, we're really troubled by this, EEOC seems to think because she used the words, at least for the record, she used the words hostile environment, that somehow, that automatically meant that she felt that she was being discriminated on the basis of her gender. Now, maybe she did. When most people in modern American society think that, who had any legal knowledge and were running departments think that? That's not true, Your Honor. And down in the trenches, that is not true at all. And that is the key, at least to the question of whether or not there was any knowledge that this was gender discrimination in the first place. And what's ironic and interesting here, too, is even if one looks at her affidavit, the affidavit that she filed. Can anybody ask what's the problem? Well, Your Honor. What happened? Absolutely. She was asked and it was discussed and what she said the problem was she wasn't getting along with her coworkers. That was clear. It was undisputed. What she didn't say was, is that she felt that she was not getting along with them because of her gender. It never came up. It was never addressed. It was asked. The question was not asked, is this because of your gender? But the question certainly was asked was, what's the problem? What's going on? Why are you having these issues and why do you want to leave the department? To which she responded, it's in the record, and not one mention of her gender came up. What did Mr. Charlton do in response to that? Of course, what he did was, is he transferred her. And he transferred her rather quickly because he wanted to ameliorate the problem that she had raised for the first and only time in August of 2002. So, again, what I'm trying to say here is this, Your Honors, the fact that he moved her at that time, at that period in time, in no way demonstrates any pretext at all, because obviously... Why is that her evidence that he assured her that she wouldn't be affected by the rest? I understand you don't believe that testimony. I understand that that's a disputed fact. And I need not say more about that. But it doesn't create an issue of pretext. Why is it that if somebody is essentially inducing somebody to do something that is to their detriment by making a promise and then reneges on the promise, on the other hand, so they're trying to put them in an adverse position and are treating them unfairly and in a way designed to hurt them? Well, Your Honor, I believe that would have relevance if she could demonstrate at the same time that it put her in a position that was any worse than if she had stayed in the PSA department, or that if she had moved over to the final assembly building, which is what she claimed she wanted to do. And ultimately, in response to this, Your Honor, of course, is that she had asked to be moved during that period of time. She wanted to be moved. And there is no evidence here that Bill Charlton knew... But she didn't want to be moved there. I'm sorry? She didn't want to be moved there. Well, again, that's a disputed question as to where she wanted to be moved. But she also didn't want to stay. So at the time that all this occurred, there was something had to be done. Mr. Charlton acted reasonably by moving her to another department at the time that she asked to be removed from the position that was causing her all this distress at the time. So, okay. You're over your time. Thank you for your argument. Rebecca? Yes, Your Honors. I'd like to start with Renee Reed. And I'd like to first expel this notion that she was sitting around waiting for a job to fall into her lap. If you look at her declaration on page 198, she says clearly in paragraph 15, I took action immediately to seek other opportunities. I phoned an email to get the word out, which is what people did. And then she goes down and she talks about some of the contacts she made. At the bottom of the page, I interviewed with Dave Tatey, an engineering manager. And only one position was filled, and that was by a manufacturing engineer named Darrell Johnson, who was also given a risk notice. So he got that job.  The employees who told me they were going to speak to Rob about assigning me to their work area, and she names names, confirmed that they did speak to Rob. However, they said that Rob, this is Fierstein, refused to put me in any of these positions. She also says, Fierstein never communicated to me about any actual or possible job openings. And I'd also just like to point out in the last paragraph of her declaration, she says that I spoke with Rob Wright shortly before he left for Christmas when I was getting laid off. At that time, he told me that it was unlikely that I would ever work for Boeing again. Now, counsel for Boeing has also questioned, again, the relevance of the co-worker assessment of how Renee Reed was doing. But what else could we do in terms of circumstantial evidence, unless we had a smoking gun when somebody is laid off in a RIP, except to give co-worker assessments, to give assessments from other managers and past managers that she worked with, and to give her own testimony to dispute that. You know, based on what Boeing's trying to argue, we would need a smoking gun in every case, and again, we're just trying to get this case to the jury. As for Antonia Castron, I'd just like to clarify that it was in 2000, the year 2000, that she and other people moved out of EPC, which is Electrical Product Center, and some of those people moved into Structure's Mod, and then they were also assessed for the RIP two years later. So they had been in Structure's Mod for two years before they were assessed for the RIP, and she had been there for two months before she was assessed for the RIP. As for whether PSA was a better place for her, that's where she was right before the transfer. We did offer evidence that it was a better place, and that a jury could find she would not have been laid off. There was evidence, clear evidence she was a good worker. Her evaluations for 2001 were better than two men who stayed in PSA, and those two men did better on a past performance score than she did. They got 13 and 11. She had only a 9. So the jury could find that had she stayed, and since her evaluation scores were even better. She didn't want to stay. She wants to leave. She did want to move to the final assembly, and she says in her declaration, I want to go there because it's a better match for my skill set. So a jury could find that had she gone to the final assembly, she would have had a better chance of surviving the RIP. Is there any evidence anybody went to the final assembly? Yes, a man named Gary Williams. So during the time she was requesting to be transferred. But not at the time that she finally said that they made the house rule, environment claim. That's true. And Bowen has also made the point that there was no evidence in the record of an opening in final assembly. I'd just like to point out, there's no evidence there was an opening in structures, Ma. There's no opening anywhere. Then why didn't they transfer her someplace where she could succeed and enhance her career? Okay. Thank you, Your Honor. Thank both counsels for their argument. Very interesting case. And that's the final case on the court's calendar for this morning. And we stand in recess.
judges: Hawkins, Berzon, Clifton